Argued and submitted April 3, reversed August 7, 1979

# STATE OF OREGON,
## *Respondent,*
### *v.*
# MARK GEORGE EMIL PELLER,
## *Petitioner.*

### (CA 11128, SC 26008)
598 P2d 684

David W. Hittle, Salem, argued the cause for petitioner. With him on the briefs were Gary L. Gardner, and Dye & Olson, Salem.

Catherine Allan, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Denecke, Chief Justice, and Holman, Tongue, Howell, Lent and Linde, Justices.

HOWELL, J.

## HOWELL, J.

This is a criminal case in which defendant was charged with possession of a stolen motor vehicle and criminal activity in drugs. The trial court entered an order suppressing certain evidence and statements obtained after a warrantless search of defendant's residence. The Court of Appeals reversed the trial court, 37 Or App 467, 587 P2d 510 (1978), and defendant petitioned this court for review. We reverse the Court of Appeals and affirm the order of the trial court.

Except as noted, the following facts are undisputed. On December 8, 1977, Deputy Holmes of the Yamhill County Sheriff's office advised Deputy Elle of the same office that a certain black and orange Porsche had been observed in McMinnville and that the car's license belonged on a Pontiac rather than a Porsche. Holmes and Elle drove to a residence in McMinnville where they saw the Porsche parked in the driveway. They went to the door, knocked, and defendant answered. Elle advised defendant of the purpose of the call and asked who owned the Porsche. Defendant responded that it belonged to his roommate, who was at work and would be home later that evening.

Elle asked defendant where his roommate could be located. Defendant said the roommate was at his girl friend's house near the high school and that the girl friend's name was Johnson. Defendant refused to allow Elle to use his telephone. Elle left a business card and told defendant to have the roommate call when he returned.

Some time during the initial encounter with defendant, Holmes advised Elle that another deputy had stopped the Porsche some time earlier, that defendant had been driving, and that defendant had lied about something. When they left defendant's residence, Elle decided to try to locate the roommate. A dispatcher, when asked to check the city directory to

try to locate anyone by the name of Johnson in the area of the high school, was unable to do so. The officers then returned to defendant's residence approximately 15 to 20 minutes after their first encounter with defendant.

The officers knocked at defendant's door, identified themselves, and called defendant's name. They stayed at the door between a minute and two minutes. Upon receiving no response, they proceeded to leave. As they were leaving, Elle checked the front license plate on the Porsche and discovered that it was different than the rear plate. A check revealed that the front plate belonged on a 1974 Plymouth. Elle then opened the driver's door and checked the vehicle identification number.

Elle and Holmes then returned to the patrol car and drove away while Elle asked the dispatcher to check the identification number. The dispatcher reported that a vehicle with that number had been reported as stolen earlier in the year in Corvallis. The officers returned to the residence less than a minute after the second visit.

Elle noticed that some changes had occurred since they left. On the first visit, several cats were in the garage; on the second they were outside; and on the third they were back in the garage and the garage was locked. Elle also noticed that the lighting inside the residence had changed.

Believing defendant was inside, Elle knocked on the door, identified himself, and told defendant he wished to talk with him. Elle received no reply, so he asked Holmes to have the dispatcher call defendant. While Holmes was gone, Elle heard a rustling noise inside the house. He tried the door, found it unlocked, and opened it enough to see into the living room. He called loudly again and received no response, but thought he heard some more rustling noises from the rear of the house. He also observed a pipe and some stems of marijuana on a table.

Elle stepped inside the house and called again for defendant. He heard some noise in the rear and started in that direction. As he went past the table, he could clearly see the marijuana. He went on to an open bedroom and located defendant standing inside a clothes closet.

Elle advised defendant of his *Miranda* rights and obtained consent to search the residence from both defendant and his roommate, who had since returned. Defendant stipulated at the hearing that he was properly advised of his rights.

Defendant was charged with possession of a stolen motor vehicle and criminal activity in drugs. Prior to trial, defendant moved to suppress all evidence obtained from the search of the Porsche and all evidence and statements obtained as a result of the entry into the residence.

At the hearing on the motion to suppress, Elle recalled that there was one door to the residence and there were windows. When advised that the police report indicated that there were two doors, he stated that without reviewing the record, he was not sure. Elle also was not sure if the windows opened. After he observed the marijuana, Elle continued his investigation to find defendant and to search for additional evidence. Elle did not first apply for a search warrant because he believed that if he and Holmes left, there was a good chance that the car would disappear. He testified that, in his experience, it took between four and ten hours to get a warrant. Defendant, however, testified that Elle had told him it would take only two to four hours to get a warrant.

Elle testified that because of the time of day he probably would not have been able to make radio contact with the district attorney's office. According to Holmes, the city police and state police would have provided assistance upon request if they had available deputies.

On February 10, 1978, the trial court entered an amended order denying defendant's motion to suppress evidence obtained from the vehicle but granting the motion to suppress evidence and statements obtained as a consequence of opening the door and entering the residence. The state appealed from that part of the court's amended order suppressing the evidence and statements obtained as a result of the deputies opening the door and entering the residence. Defendant did not cross appeal.

The trial court specifically ruled,

> "All evidence seized and statements made after the uninvited entry into the residence at 665 East 26th, McMinnville was unlawfully obtained *as there were no exigent circumstances to justify the entry even though there was probable cause.*
>
> " * * * [D]efendant's motion, to the extent it applies to evidence and statements obtained subsequent to the entry into the residence, is granted." (Emphasis added.)

In reviewing the facts, we note initially that the burden is on the state to justify the warrantless search. ORS 133.693(4). We are bound by the trial court's determination of what actually happened, and our function is limited to determining whether or not the trial court correctly applied the constitutional principles. *See State v. Warner,* 284 Or 147, 156-59, 585 P2d 681 (1978).[1]

The fourth amendment to the United States Constitution prohibits "unreasonable searches and seizures." The United States Supreme Court has interpreted this to mean that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable * * *—subject to

---

[1] Although the issue in *Warner* was whether or not consent to a warrantless search was voluntary, as opposed to whether or not exigent circumstances justified the search, we conclude that the same scope of review applies in this situation. *See State v. Hickmann,* 21 Or App 303, 308, 534 P2d 1153 (1975) (Schwab, C.J. concurring and dissenting), *rev'd on other grounds,* 273 Or 358, 540 P2d 1406 (1975).

only a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 US 347, 357 (1967). [2] In *State v. Olson,* 287 Or 157, 598 P2d 670 (1979), we held that the Fourth Amendment requirements pertaining to searches are also applicable when the police enter a private home for purposes of arresting the occupant. *See also Coolidge v. New Hampshire,* 403 US 443, 473-84 (1971); *People v. Ramey,* 16 Cal 3d 263, 127 Cal Rptr 629, 545 P2d 1333, cert. denied 429 US 929 (1976). *Cf., United States v. Watson,* 423 US 411 (1976). *Contra, People v. Payton/Riddick,* 45 NY2d 300, 380 NE2d 224, 408 NYS2d 395, *prob juris noted* 99 S Ct 718, 58 LEd2d 703 (1978).

Although the police officers in the present case failed to secure either a search or an arrest warrant prior to entering the defendant's home, the state contends that the entry was lawful because (1) the police had probable cause to believe defendant had committed a felony and was within the residence, and (2) "exigent circumstances" excused the police from obtaining a warrant.

We shall assume, without deciding, that the police had probable cause to arrest the defendant and probable cause to believe he was within the residence. As we observed in *State v. Olson, supra,* however, such probable cause by itself "justifies only the issuance of a warrant." 287 Or at 165. In order to justify a

---

[2] The theory underlying the warrant requirement was articulated by Justice Jackson in an oft-quoted passage from *Johnson v. United States,* 333 US 10, 13-14 (1948):

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* * * *" (Emphasis added.)

warrantless entry such as occurred in this case, the state must also show that "the exigencies of the situation made that course imperative." *Warden v. Hayden,* 387 US 294, 298-99 (1967), *quoting McDonald v. United States,* 335 US 451, 456 (1948).

Neither this court nor the United States Supreme Court has ever attempted to comprehensively define "exigent circumstances." In *State v. Greene,* 285 Or 337, 342, 591 P2d 1362 (1979), we noted that the theory underlying the concept is one of "practical necessity." In certain cases, the societal interest in a warrantless search or seizure is simply believed to outweigh the interest in requiring prior judicial approval of such government action. Examples include cases involving danger to the lives of the arresting officers or others, *Warden v. Hayden, supra;* cases where the delay attendant to issuance of a warrant would lead to destruction of evidence, *Schmerber v. California,* 384 US 757, 770-71 (1966); cases involving "hot pursuit" by a police officer, *United States v. Santana,* 427 US 38 (1976); and an incredibly diverse number of others. *See generally, Dorman v. United States,* 435 F2d 385 (DC Cir 1970) (listing factors to be considered in determining whether "exigent circumstances" or "urgent need" are present); Note, 28 Syracuse L Rev 787, 802 n. 86 (1977).

The nature of the problem and the diversity of factual situations in which the problem arises necessarily preclude the "clarity and certainty" that might otherwise be desirable in this area. Such uncertainty, however, is the inevitable result of "the essential tension that springs from the uncertain mandate which this provision of the Constitution gives" to the courts. *Coolidge v. New Hampshire, supra* at 484, quoting *California v. Byers,* 402 US 424, 450 (1971) (Harlan, J. concurring). *See also,* Amsterdam, *Perspectives On the Fourth Amendment,* 58 Minn L Rev 349 (1974). We note this uncertainty as a means of emphasizing that our holding on the facts of the

present case will not necessarily govern future cases involving different factual patterns, even though they may arise in similar contexts.

There is no evidence in this case that warrantless entry was necessary because defendant was dangerous, or that such an entry was necessary to prevent destruction of evidence.[3] The state's primary contention is that the entry was necessary because of the possibility that defendant would escape.

Both in the trial court and on appeal, the state has relied primarily on our decision in *State v. Girard,* 276 Or 511, 555 P2d 445 (1976). In *Girard,* the investigating officers went to the defendant's home on information that defendant's truck had been seen in the vicinity of a burglarized residence. Defendant's explanation for his presence near the residence was unsatisfactory and the officers requested, but were denied, entry to the house. The officers then informed defendant that they would stake out the house and obtain a search warrant.

After calling for assistance, the officers saw defendant in the back yard carrying a box toward the back fence. Upon spotting the police, defendant returned to the house with the box. The officers then found what appeared to be some of the stolen goods near the fence. One of the officers knocked on the back door of the house and heard a male voice say, "Hurry, they are coming." The officer identified himself and demanded entry. When no response was forthcoming, the door was forced open.

On these facts, we held that there were sufficient exigent circumstances to justify the warrantless entry into defendant's home. We rejected defendant's argument that the two officers should have surrounded the

---

[3] The state contends that the police had reason to believe that defendant was in a position to destroy the keys to the stolen automobile. There is no evidence, however, that the police even had reason to believe defendant was in possession of the keys, much less in a position to destroy them. The principal evidence of the automobile theft was, of course, the automobile itself, which was parked outside the house.

house to prevent the escape while awaiting reinforcements, saying:

> "* * * That [argument] involves a large measure of speculation, depending upon a variety of factors relating to the feasibility of 'surrounding' the house or otherwise preventing escape, including the size of the house, the number of exits, the proximity of the house to cover for a person bent on escape, visibility, etc. In the exigencies of the moment, the officers could not reasonably be expected to put fine weights in the scale in weighing the chances of securing the house or of losing their quarry." 276 Or at 515.

The Court of Appeals focused upon this language in the present case and concluded:

> "* * * An officer is not required to stand around and wait for a defendant to choose which of several potential exits defendant may wish to use to 'make a break.' Exigent circumstances arise when the possibility of 'making a break' exists." 37 Or App at 475.

We agree that this is the correct rule when the officers have reason to believe the defendant intends to "make a break," as was the case in *Girard.* We do not agree, however, that the mere possibility that defendant could make a break if he were so inclined gives rise to *exigent circumstances when there is no indication that* he is, in fact, so inclined. Under the Court of Appeals' holding, a warrantless entry would be justified any time the police announced their presence and the defendant refused to come out of his home. The practical effect of this would be to all but eliminate the requirement that there be exigent circumstances in order to justify a warrantless entry to arrest.

■ In the present case, unlike *Girard,* the police had no indication that defendant would attempt to "make a break," even if he could have done so. In *Girard,* the police had seen the defendant attempting to leave the house and had heard him say "Hurry, they are coming," when they demanded entry. In the present case, the defendant simply remained in his house and refused to respond to the police. Such actions are as

consistent with an intent to remain in the house as they are with an intent to escape. Absent any indications that escape was imminent, the officers in the present case should have staked out the house and obtained a warrant before entering.

For these reasons, we agree with the trial court that the circumstances in this case were not sufficiently exigent to justify a warrantless entry into defendant's home. Consequently, the trial court did not err in suppressing the evidence and statements obtained as a result of that entry. *See State v. Olson, supra.*

The decision of the Court of Appeals is reversed.