Argued and submitted November 23, 1981, reversed and remanded
for a new trial April 5, reconsideration denied May 13,
petition for review denied June 1, 1982 (293 Or 190)

STATE OF OREGON,
*Respondent,*

*v.*

JAY MONROE COLLICOTT,
*Appellant.*

(No. C80-11 33999, CA A20816)

642 P2d 1187

Clint A. Lonergan, Portland, argued the cause for appellant. With him on the brief were Howard R. Lonergan, and Richard L. Lonergan, Portland.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Roberts, Judge Pro Tempore.

JOSEPH, C. J.

Gillette, P. J., concurring.

## JOSEPH, C. J.

Defendant appeals his conviction for possession of a controlled substance.[1] He contends that the trial court erred in denying his motion to suppress evidence found at his residence as the result of a warrantless search. Although the issue framed by the parties is whether there were exigent circumstances to justify the warrantless search, the primary question is at what time probable cause arose.

On September 16, 1980, Deputy Sayler of the Multnomah County Sheriff's Office received a report from another deputy that asked him to contact two informants, Julia Ems and Janette Stockton, with respect to drug trafficking in the Portland area. The informants had told the other deputy that they had seen defendant at a friend's house with cocaine in his possession. As found by the trial court,

"Because of the information passed to the police by the informants, a deal was made with the informants to set up a situation whereby they would arrange to go with defendant to Prineville and perform sexual acts in exchange for drugs."

In the presence of police, the women telephoned defendant and arranged to meet him and another man at defendant's house on the evening of September 19, 1980. The women were told they would receive drugs for services and that drugs would be at the house. They were to leave defendant's house for Prineville, where the filming of a pornographic movie would take place.

Police were to follow the women to the house, and two officers were to wait in an unmarked car and watch the driveway. Deputy Sayler and Deputy Farr were to wait in a telephone booth some six blocks away, and the women were to call there and use the words "Uncle Charlie" as soon as they saw any narcotics. The police informed the women

---

[1] Defendant was originally charged with three counts of possession of a controlled substance (LSD, marijuana, and cocaine), ORS 475.992(1), and one count of delivery of a controlled substance (LSD). ORS 475.992(1). After the denial of his motion to suppress, he waived trial by jury and was found guilty of one count of possession of a controlled substance. ORS 475.992(1)(a). The court dismissed the other counts.

that, if no telephone call were made, they would go into the house to "save" them if they were not out within 10 minutes.

Everything was carried out as planned. The women were followed to defendant's house. Two to five minutes after entering, they called Deputy Farr at the designated phone booth and gave him the "Uncle Charlie" signal. The police then knocked on the door and, when the latch clicked, opened the door with their weapons drawn. They saw "Mickey Mouse acid"[2] on the coffee table, seized it and then searched the house.[3] A search warrant was never sought.

The trial court concluded that, because

"* * * *it wouldn't necessarily be true* that the drugs would be on the premises that were searched in this case * * * [and] the first time that the police really had that information was when the telephone call came from the girls with the prearranged signal," (emphasis supplied)

the police did not have probable cause to believe drugs would be present at defendant's residence until that prearranged signal was given. Because defendant's departure for Prineville was imminent at the time of the signal, the court further concluded, there were exigent circumstances justifying the warrantless search.

■ ■ The trial court misapplied the probable cause standard. Probable cause does not require certainty. While a mere possibility that drugs would be present at defendant's residence would not give rise to probable cause, *State v. Feehely,* 27 Or App 343, 347, 556 P2d 142 (1976), *rev den* (1977), a "well-warranted suspicion" would. *State v. Evans,* 16 Or App 189, 193, 517 P2d 1225, *rev den* (1974); *but see State v. Butler,* 56 Or App 318, 641 P2d 655 (1982).

■ ■ The police had ample grounds to believe that the informants were credible and that their information was

---

[2] "Mickey Mouse acid" is lysergic acid diethylamide (LSD) on paper on which cartoon figures of Mickey Mouse are stamped.

[3] Because the trial court dismissed the counts regarding the evidence found as a result of the house search, the suppression of that evidence is not an issue on appeal.

reliable.[4] According to Deputy Sayler's testimony, the women said that they were familiar with drugs, that they knew what "Mickey Mouse acid" looked like and that they had "in fact, experimented at one time or another with some drugs." He said that they had earlier turned over to police marijuana which had been given them at another house by defendant and the other man. Deputy Sayler stood next to the women as they made the telephone call to defendant. He instructed them to ask about the pornographic movie and overheard them ask about the presence of drugs at defendant's house. They indicated defendant's affirmative replies. The entire plan was premised on the reliability of the two informants. There is no reason to believe that the informants were more credible or their information more reliable at the moment they gave the "Uncle Charlie" signal than when they telephoned defendant in the presence of the police. We conclude that the police had probable cause to believe drugs would be present at defendant's residence at the time the women made the arrangement to meet defendant.[5]

■     The state points out that Deputy Sayler testified that, although he personally believed that defendant would have drugs at his residence, he did not think that he had sufficient cause for that belief to obtain a search warrant. Be that as it may, an officer's subjective belief as to the existence of probable cause is not determinative. *See State v. Cloman,* 254 Or 1, 456 P2d 67 (1969); *State v. Christian,* 35 Or App 339, 343, 581 P2d 132, *rev den* 284 Or 521 (1978).

■     Stockton testified that she telephoned defendant two to three days before they were to meet. Deputy Sayler stated that the phone call was made either one or two days

---

[4] When an affidavit in support of a search warrant is based upon hearsay information supplied by an informant, the affidavit must contain facts to show (1) the informant's "basis of knowledge" and (2) that the informant is credible or that his information is reliable. *State v. Montigue,* 288 Or 359, 605 P2d 656 (1980). Although *Montigue* deals with the question of the sufficiency of an *affidavit,* the central question here is also the reliability of information supplied to the police.

[5] Although we are bound by the trial judge's finding of what actually happened, *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), we are not bound by his conclusion that probable cause did not exist until the moment of the signal. *State v. Peller,* 287 Or 255, 260, 598 P2d 684 (1979); *State v. Warner,* 284 Or 147, 156-158, 585 P2d 681 (1978).

before the meeting. In either event, the officers had time to obtain a warrant before the planned meeting. *See State v. Rubert,* 46 Or App 843, 612 P2d 771 (1980). The exigency that the evidence would be destroyed was brought about by the police and, as such, cannot support the warrantless entry into defendant's house. *State v. Fondren,* 285 Or 361, 367, 591 P2d 1374 (1979). What was said in *State v. Matsen/Wilson,* 287 Or 581, 587, 601 P2d 784 (1979), is particularly in point:

> "The police cannot weave together a web of information, then claim exigent circumstances when the suspect arrives and can conveniently be snared."

Reversed and remanded for a new trial.

**GILLETTE, P. J.,** concurring.

I concur in the lead opinion, and write only to note how narrow our holding is, and to answer two questions it might, at first glance, appear to create.

We hold today that an officer who possesses probable cause to search a place for drugs must seek a warrant from a magistrate if he has time to do so. That principle could hardly come as a surprise. *See, e.g., State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979). What makes this case a potentially difficult precedent is the fact that the trial court here did not believe the police *had* probable cause, prior to confirmation from inside the house, that the drugs were there. What, one might ask, is unreasonable about waiting until receiving confirmation from inside?

The answer, of course, is that seeking confirmation before entering may be a good idea, but it has nothing to do with probable cause. An officer who has (or even thinks he *might* have) probable cause *must seek a warrant if there is time to do so.* If, after having obtained a warrant, he wishes to utilize the procedure used in this case to assure that the warrant is not wasted and a confidential informant revealed, that is permissible. But the warrant must be obtained.

A final question remains: What if the police *had sought* a warrant and the magistrate, as the trial judge here, did not find probable cause? Would our later conclusion that there *was* probable cause invalidate a search without a warrant under such circumstances?

No. The Fourth Amendment and Article I, section 9, of the Oregon Constitution forbid only *unreasonable* searches. Under the circumstances of this case, had the officers sought but been unable to obtain a warrant, their subsequent actions would have been reasonable.

With these further observations, I join in the opinion of the court.[1]

---

[1] The Chief Judge advises me that he agrees with this concurring opinion, noting only that—as I in turn agree—the answers stated here are not strictly necessary to decide the case before us.