Argued and submitted August 30, 1982; resubmitted In Banc September 9, 1983, affirmed in part; reversed in part and remanded for new trial January 25, reconsideration denied March 9, petition for review denied May 15, 1984 (297 Or 124)

## STATE OF OREGON,
*Respondent,*

*v.*

## JEFFREY DALE COTA,
*Appellant.*

(C81-01-30768, C81-01-30911; CA A23491, A23492)
(Cases consolidated.)

675 P2d 1101

David Lawrence Olstad, Portland, argued the cause and filed the brief for appellant.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were

Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

GILLETTE, J.

Newman, J., concurring.

Buttler, J., specially concurring.

Rossman, J., dissenting.

## GILLETTE, J.

Defendant appeals his convictions on three counts of possession of a controlled substance, ORS 475.992(4), and one count of delivery of a controlled substance. ORS 475.992(1). Two of the possession counts are based on evidence discovered when police officers were executing a warrant for defendant's arrest at his residence. He contends that the trial court erred in denying his motion to suppress that evidence, because the search of his home violated his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment. We reverse.

The following facts are taken from the trial court's memorandum opinion and are supported by the evidence:

"On January 31, 1981, four police officers had been serving a series of warrants, which they had been given for service earlier in the day. At about 5:25 p.m. that evening, they approached the residence involved here. At that time of year, no doubt it was dark. They had a warrant for the arrest of Jeffrey Cota, and the warrant showed an address '2949 SE Taylor.'[1] The warrant was for a drug offense and grew out of a so-called 'sting operation', in which, evidently, a police officer or informant had acted as a fence in order to apprehend persons dealing in stolen property. Many arrest warrants had been issued and were being simultaneously served by several teams of police officers.

"The officers did not know Mr. Cota, and evidently knew nothing of the alleged crime. They had no knowledge or probable cause to arrest Cota other than the warrant. They had a photograph of Cota. No evidence was offered tending to show they had any particular reason for concern about violence, resistance, other persons, or weapons in connection with serving the warrant. The Taylor street address was, in fact, Cota's home, and the officers no doubt assumed that, but did not otherwise know he lived there.

"Two officers went to the rear of the house, while two officers walked up to the front door. From the front porch, those officers saw, through a window, a small boy go from the living room through the kitchen and come back with a man. The man came to the door and opened it. From the picture, the officers recognized him as Cota. The officers asked him if he was Jeffrey Cota, and he acknowledged he was. Cota was

---

[1] The address was actually "9249" SE Taylor.

standing at the door, but inside the house, with the front door of the house open. The officers were standing on the front porch and the screen door was open. An officer handed Cota a copy of the warrant of arrest and told him he was under arrest. Cota did not resist by word or act and did not attempt to retreat from the doorway. Cota did not invite the officers into the house. Nor did he object to, or resist, their entry. They simply walked in without requesting his consent. Cota submitted to the authority of the officers.

"The officers entered the house, rather than simply handcuffing Cota at the door and leading him away, because they thought they were authorized to do so by reason of the warrant. They also called into the house the two officers who were covering the rear of the house.

"There is no evidence the officers had any knowledge who the child was, who his parents were, or whether there was anyone else in the house.

"One or more officers testified that they entered the house to be sure there was someone to assume responsibility for the child. That appears to be an afterthought. It was only after entering that they, quite properly, were concerned about ascertaining who the child's parents were, to be sure there was a responsible adult with whom the child could be left.

"One or more officers testified that because it was winter, they needed to go inside with Cota to permit him to get a coat before taking him away. This again appears to be an afterthought. I find this was not their purpose or reason for entering. Cota was fully dressed, was not asked if he wanted to get a coat, and there was no evidence of cold or rainy weather. There was no evidence that a coat was obtained for him before he was taken from the house.

"There was no evidence from which to conclude the officers initially entered in order to search the immediate area of the arrest, or to conduct a so-called protective sweep of the premises to make sure there was no other person present who might endanger their safety.

"The officers were, no doubt, not unaware that in entering the house, they might discover in plain view and seize evidence of a crime. There is no evidence that this was a compelling reason for their entry, but was perhaps a factor.

"While in the house, Officer Englert obtained the consent of Cota to search the house. However, Officer Reynolds found the drugs and paraphernalia involved in this aspect of the motion to suppress, in an upstairs room while checking to see

if there was anyone else in the room. Officer Reynolds was not searching pursuant to consent given by Cota to Officer Englert. The state did not prove that the consent was actually given prior to Officer Reynolds going upstairs. The written consent by Cota was signed after the discovery of the drugs by Officer Reynolds and after defendant Killmon was arrested."

The record also shows that just after the officers entered the residence, Reynolds began to question defendant about the 10-year-old boy, Danny. He asked defendant "whose boy is this" and whether there was anyone else in the house to care for the boy. Defendant responded that no one else was in the residence but was noncommittal and shrugged his shoulders as to the other inquiries. Reynolds asked the boy where his father was and was told by Danny "I'll show you." Reynolds followed Danny through the house to an area near the garage. As they approached an open sliding glass door, Reynolds saw Killmon, Danny's father, standing on a stairway behind the door. He directed Killmon to come down the steps and he patted him down for weapons.

Reynolds testified that, because defendant had told him no one else was in the house and that he had just discovered Killmon, he went up the stairway to see if there was anyone else there. After reaching the top of the stairs he saw a table in the middle of a small room with what appeared to be cocaine and drug paraphernalia on it. Reynolds found no one else in the room and returned downstairs where he arrested Killmon. The evidence found on the table is the subject of the motion to suppress.

During much of the period it has been before this court, the debate over this case has concerned the issue that arises first chronologically: whether the officers' initial entry was unlawful, making the subsequent activities leading to the discovery of the contraband also unlawful. The question is interesting, and it is arguable either way. However, we do not find it necessary to answer it, because we hold that, even assuming that the officers' initial entry into the house was justified by a concern for the safety of the child whom the officers had seen inside, that justification was lost when the officers encountered Killmon.[2] Once he had been found, there

---

[2] The separate opinion of Buttler, J., takes us to task for bypassing this issue. "To avoid the issue, as the majority does," that opinion warns us solemnly, "is to leave law

was no "practical necessity," *see State v. Lowry,* 295 Or 337, 347, 667 P2d 996 (1983), for any officer to go farther into the house. The contraband that is the subject of this case was discovered after Killmon was located and after the officers' only other legitimate purpose at or in the house—the arrest of defendant—had already occurred. The evidence should have been suppressed.

CA A23492 is reversed and remanded for a new trial; CA A23491 is affirmed.

**NEWMAN, J.,** concurring.

I concur in the majority's opinion holding that the evidence should be suppressed even assuming that the officers' initial entry into the house was justified by a concern for the safety of the child. Once Killmon, the child's father, was found there was no practical necessity for any officer to go farther into the house. *See State v. Lowry,* 295 Or 337, 347, 667 P2d 996 (1983).

I also concur, however, in that portion of Judge Buttler's concurrence that holds that the evidence should be suppressed because the officers' entry into defendant's house was unlawful in the first place.

**BUTTLER, J.,** specially concurring.

I concur only in the result and accept virtually none of the majority's reasoning.

The unlawful police activity requiring suppression here was their unnecessary massive intrusion into defendant's home, not their activity after the unlawful entry. Accordingly, although I agree that we must reverse, I do not agree that the alleged entry is irrelevant and disagree with the majority's

---

enforcement officers unsure about what they may and may not do lawfully * * *." 66 Or App at 664. Hardly. *State v. Olson,* 287 Or 157, 598 P2d 670 (1979), and *State v. Jordan,* 288 Or 391, 605 P2d 646, *cert den* 449 US 846 (1980), seem to us to establish essentially the bright line rule for which Buttler, J., contends. The trouble lies not in the rule, but in its *application.* The officers here *did* see the child inside. The fact that they did not *think of* assuring the child's safety—we take it that is what the trial court meant in referring to that idea as an "after-thought"—may, in spite of the separate opinion's fixation on that word, be irrelevant. If the officers' acts were objectively reasonable, they may be sustainable, anyway. *See State v. Cloman,* 254 Or 1, 456 P2d 67 (1969). We avoid *this* question—the continuing vitality of the *Cloman* "objective justification" rationale—by resolving the case on a separate—and clear—basis.

holding that, if the officers were lawfully inside defendant's home, they were not authorized as a matter of "practical necessity" to look for other persons after they found Killmon, who declined to talk to them, after defendant had told them no one else was there. On that point, I agree with the dissent of Rossman, J., if that question is properly before us.[1]

Reversal is necessary, because the officers had no authority to enter defendant's home in the first place. The state contends that, not only is that the principal issue, it is the *only* one properly before us. As framed by the state, the question is whether police officers possessing a valid arrest warrant have the absolute right to enter a suspect's home when there is no necessity for doing so in order to effect the arrest. Here, the officers justified their entry based on the arrest warrant, not necessity, and the state contends that the officers were correct. The majority ignores that problem, and the dissent by Rossman, J., accepts the state's contention. Because I do not think that such an important problem should be ignored, and because I think the dissent erroneously resolves it, I dissent.

By avoiding the issue, the majority is able to narrow the scope of the officers' activities after they entered. If, as the state contends, and as the officers said they believed, the arrest warrant authorized entry into defendant's home "to complete the arrest," regardless of any necessity to do so, and the officers observed Killmon descending the stairs after defendant told them no one else was in the house, they had the right, for their own safety, to see if anyone else was upstairs. *See State v. Miller,* 45 Or App 407, 608 P2d 595, *rev den* 289 Or 275 (1980); *State v. Garza,* 32 Or App 643, 574 P2d 1151, *rev den* 283 Or 1 (1978).

Rather than accept the state's position, with the resulting broader scope of permissible police activity once inside, the majority would assume that the entry, if lawful, was justified out of concern for the safety of the child. It is safer to

---

[1]The disposition of the motion to suppress was divided into two parts. At the conclusion of the pretrial hearing, the trial court ruled that the officers' conduct after they had entered the residence was permissible, but took under advisement the question whether the initial entry was lawful. Subsequently, by a letter opinion, the court ruled that the entry was reasonable under all of the circumstances. Defendant's first assignment of error quotes only from the letter opinion deciding that the entry was reasonable. Accordingly, the state contends that that issue is the only one properly raised by defendant, and it may be right.

assume that justification than it is to decide it, because it ignores the findings of the trial court that the officers entered because they believed that the arrest warrant authorized entry, that as they stepped in the front door they called into the house the two officers who were covering the rear of the house, that any concern for the child was an afterthought, and that it was only after entering that they became concerned about there being a responsible adult with whom the child could be left. We are bound by those findings, *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968), and they do not support the conclusion that the officers entered defendant's home out of concern for the child. That concern came later, as the trial court found.[2] Presumably, that is why the state urges that the arrest warrant *per se* constituted sufficient authority to enter.

By ignoring the real problem, the court's decision permits judges to evaluate police conduct *after* they have entered a citizen's home *unlawfully*. Police may not create, by unlawful conduct, exigent circumstances or a situation giving rise to the practical necessity to engage in further activity. *See State v. Hansen*, 295 Or 78, 664 P2d 1095 (1983). The majority's analysis is both dangerous and erroneous. If the police were lawfully in defendant's home, what they did in response to their *then* concern for the welfare of Danny was in response to what reasonably appeared to them, *after* entering, as practical necessity, and was reasonable.

If I were to reach that question, I would agree with the dissenting opinion of Rossman, J. Killmon refused to say whether he was Danny's father, and defendant had already lied to the officers by denying that anyone other than himself and the boy were in the house. Given those facts, if the officers entered out of concern for the boy, they had the choice of taking defendant away, leaving Danny with a man who refused to acknowledge responsibility for him,[3] or of looking

---

[2] The majority disposes of this problem by saying (n 2) so what? — *if* the officers had been concerned for the boy's safety when they saw him, they might have been justified in entering to assure that he would not be left alone, citing *State v. Cloman*, 254 Or 1, 456 P2d 67 (1969). *Cloman* does not go so far. There the officers *had* sufficient facts to constitute probable cause to arrest the defendant for the crime of theft, but were not sure enough to arrest him for that reason, so they arrested him for violation of an "after hours" ordinance. In contrast, here we would be required to invent a fact that did not exist until *after* the officers unlawfully entered the house.

[3] The majority apparently holds that because Danny had said that his father was there and identified Killmon as his father, the officers were obligated to accept the boy's statements. If that is so, the officers could have asked Danny before they entered if his father was there.

for another person who would accept that responsibility. Under the majority's assumed justification for entry, the police acted reasonably, and the evidence observed in plain view should not be suppressed.

However, the unlawful entry does require suppression. Although the dissenters accept the trial court's findings, most of which are quoted in the majority opinion, they accept the state's argument that the officers were justified in entering in order to complete the arrest, apparently ignoring those findings. Some of them bear repeating:

> "* * * The officers asked him if he was Jeffrey Cota, and he acknowledged he was. Cota was standing at the door, but inside the house, with the front door of the house open. The officers were standing on the front porch and the screen door was open. An officer handed Cota a copy of the warrant of arrest and told him he was under arrest. Cota did not resist by word or act and did not attempt to retreat from the doorway. Cota did not invite the officers into the house. Nor did he object to, or resist, their entry. They simply walked in without requesting his consent. Cota submitted to the authority of the officers.
>
> "The officers entered the house, rather than simply handcuffing Cota at the door and leading him away, because they thought they were authorized to do so by reason of the warrant. They also called into the house the two officers who were covering the rear of the house."

Given those facts, it is fanciful, indeed, to treat this case as one where the officers either had to enter defendant's home to arrest him or to wait at the threshold while the suspect hides or flees. 66 Or App at 652-53, citing *State v. Jordan*, 288 Or 391, 605 P2d 646, *cert den* 449 US 846 (1980).

It is also fanciful to say that the officers did nothing more than step across the threshold and take defendant into custody. 66 Or App at 653. The trial court found that the officers "walked in without requesting [defendant's] consent. * * * [They] entered the house, rather than simply handcuffing Cota at the door and leading him away. * * *" After entering the house and handcuffing defendant, the officers took defendant into a bedroom. The officers did not testify that it was necessary to enter the house to "complete the arrest," and the trial court expressly found that it was not. Accordingly, I think it would be disingenuous to adopt a "one foot over the

threshold" analysis to justify a total invasion of the suspect's home from both the front and back doors and the subsequent sweep of the house based on the "necessity" created by the officers' entry.

Both the state and the dissenters rely on *State v. Jordan, supra,* and *Payton v. New York,* 445 US 573, 100 S Ct 1371, 63 L Ed 2d 639 (1980), contending that those cases stand for the proposition that police officers have the absolute right to enter private premises to make an arrest if they have a warrant for the arrest of an occupant.[4] Neither case stands for so broad a proposition.

If the state constitution affords defendant the protection he claims, it is unnecessary to consider whether he is protected by the Fourth Amendment. *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983). Although the wording of Article I, section 9, of the Oregon Constitution and the Fourth Amendment are substantially identical and the Oregon courts typically have followed the United States Supreme Court's interpretation of that language, it does not follow that we have delegated to the federal courts the authority to interpret the state constitution. *See State v. Caraher,* 293 Or 741, 653 P2d 942 (1982).

The question here has not been squarely decided by either the Oregon courts or the United States Supreme Court. Before discussing the federal decision in *Payton v. New York, supra,* on which the state relies, I consider the extent to which the Oregon court has relied on Article I, section 9, in deciding whether officers may enter the suspect's home when they have authority to arrest him. In *State v. Girard,* 276 Or 511, 555 P2d 445 (1976), the court held that the officers had probable cause to arrest the defendant without a warrant and that there were exigent circumstances sufficient to authorize their entry into the defendant's residence, where they knew he was, in order to effect the arrest. It was assumed that, in the absence of exigent circumstances, the officers could not enter the house, and the

---

[4]The state also argues that the entry can be upheld under a "rule of 'reasonableness,'" relying on *Washington v. Chrisman,* 455 US 1, 102 S Ct 812, 70 L Ed 2d 778 (1982). In *Chrisman,* the defendant had been arrested but wanted to go to his abode to get some things. He was permitted to do so, and the officers followed him into his room, where they observed contraband. The Court held that the officers, after arresting the defendant, were authorized to stay with him. That is not this case.

only question was whether there were exigent circumstances. In holding that there were, the court cited neither the state nor federal Constitution.

In *State v. Olson,* 287 Or 157, 598 P2d 670 (1979), the court, relying on both Article I, section 9, of the Oregon Constitution and the Fourth Amendment, held that officers may not enter a private residence to effect an arrest without an arrest warrant, even though they have probable cause to arrest the suspect and to believe that he is in the house, in the absence of exigent circumstances requiring action before a warrant could be obtained, or unless they are in "hot pursuit." The state had relied in part on ORS 133.235(5), which authorizes an officer to enter premises in which he has probable cause to believe the suspect to be present in order to make an arrest. The court pointed out:

> "If probable cause to arrest is all a police officer needs to make constitutionally reasonable a forced entry into a person's house to arrest him, it is obvious that there will be little necessity for the officer ever to get a warrant; the requirement for entry without a warrant and for getting a warrant would be the same. If an officer does not have to have a warrant to force an entry into the house of a person for his arrest, the officer surely does not have to have one to enter any place else for that purpose. Yet the constitutional provisions obviously must contemplate situations in which a warrant is required."

Accordingly, the court held that the application of that statute would be unconstitutional when there are no exigent circumstances justifying an entry without a warrant.

*State v. Peller,* 287 Or 255, 598 P2d 684 (1979), decided a week after *Olson,* followed the rule laid down in *Olson* and held that physical evidence and statements obtained as a result of the unlawful entry must be suppressed.[5] Then came *State v. Jordan, supra.* There, the police officers approached the residence of a woman (Sandra Jordan), for whom they had an outstanding arrest warrant; the officers did not know her. They were met at the door by a woman who identified herself as "Juanita Adams" but refused to produce any identification. A records check reported that name as an alias for Sandra Jordan, so the officers took the woman into

---

[5]In *State v. Peller, supra,* the court cited only the Fourth Amendment, but relied primarily on *State v. Olson, supra.*

custody. While in the police car, however, they discovered that the woman did not resemble a mug shot of Sandra. They then entered the house and found Sandra hiding in the attic. A divided court upheld the entry of the house without a search warrant, stating:

> "Accordingly, we hold that police officers may enter private premises *to make* an arrest if they have a valid arrest warrant and probable cause to believe that the subject of the warrant is present on the premises. Neither the fourth amendment to the United States Constitution nor article I, section 9, of the Oregon Constitution requires that police officers also obtain a search warrant." 288 Or at 402. (Emphasis supplied.)

Even if it is necessary to enter the house to effectuate the arrest, the entry is limited to that purpose. The court stated:

> "* * * Furthermore, the entry pursuant to an arrest warrant is valid *only for the purpose of making the arrest* and not for the purpose of conducting a general search. * * *" 288 Or at 402. (Emphasis supplied.)

Those cases tell us that Article I, section 9, prohibits the police from entering a private residence to effect an arrest, with or without an arrest warrant, except under limited circumstances. If they have probable cause to arrest and to believe that the suspect is in the house, but have no warrant, they may enter only in "hot pursuit" or if there are exigent circumstances. If they have a warrant and have probable cause to believe the suspect is in the house, they may enter if it is necessary to effect the arrest. I do not construe *Jordan,* as the state does, to authorize entry, even though it is not necessary, if the police have an arrest warrant. To the contrary, I think it is clear that, but for the necessity of entering the house to find the suspect whom the officers had probable cause to believe was in the house, the entry would have required a search warrant.

Neither do I understand *Payton v. New York, supra,* to support the broad rule espoused by the state. The only issue in *Payton* was the constitutionality of New York statutes authorizing police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest. The court held that the statutes violated the Fourth Amendment, but went on to state that the police may

enter if they have an arrest warrant and if they reasonably believe the suspect is inside the house. The court stated:

> "* * * It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it *the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.*" 445 US at 602-03. (Emphasis supplied.)

That interpretation of the Fourth Amendment is consistent with *Jordan's* intepretation of Article I, section 9.

Clearly, the state's reliance on *Jordan* and *Payton* is unfounded. Here there was no necessity to enter defendant's house in order to make the arrest. The officers advised defendant that he was under arrest while he was standing in the doorway. The trial court found that defendant neither resisted nor retreated; he submitted to the authority of the officers. There is no explanation why they did not handcuff him on the spot, search him incident to the arrest, inform him of his rights and lead him away — mission accomplished.

Although the state recognizes that the entry was unnecessary, it argues that police have an "absolute right" to enter the premises under *Payton* and *Jordan*. It contends that the arrest was not "complete" when defendant was advised he was under arrest and shown the warrant, and that

> "* * * the remainder of the arrest could lawfully take place within the house, and defendant's removal away from the doorway to a more convenient and safer location within the premises was logically (and reasonably) pursuant to the officers' established right of entry."

That argument goes too far; it would eliminate any requirement of necessity to enter a house to effectuate an arrest pursuant to a warrant. Any time the suspect is found at home, the police would be authorized to "complete" the arrest by taking him inside and, once inside, seize evidence in plain view

and would, perhaps, be justified in making a "protective sweep" of the premises. The need for search warrants would be minimized. In *Jordan,* the suspect was attempting to conceal herself in her house, and the officers had probable cause to believe that she was within when their initial attempt to arrest "her" at her doorway was deliberately frustrated by the woman who led them to believe she was the suspect. The dictum in *Payton* confirms that view of Fourth Amendment limits on entry.

It seems clear that the officers did not have authority to enter defendant's home solely by virtue of the arrest warrant, in the absence of any necessity to do so to effect the arrest. Although the trial court found that there was no need for the officers to enter, it concluded that the entry was "reasonable under all of the circumstances,"[6] including the officers' concern for the welfare of the boy in the house. The state does not contend in its brief that the trial court should be affirmed on that ground, and I would not do so. The trial court's finding that the police entered because they believed the warrant gave them that authority and the finding that their concern for the boy was an afterthought do not support the court's conclusion. The initial entry into defendant's residence was not necessary and, therefore, violated Article I, section 9, of the Oregon Constitution.

To avoid the issue, as the majority does, is to leave law enforcement officers unsure about what they may and may not do lawfully. Given the issue as presented by the officers, the trial court's findings, defendant's assignment of error and the state's brief, we should draw the bright line that the posture of this case calls for: an arrest warrant does not

---

[6]The trial court concluded:

"As stated in the dissent in Payton, 'our cases establish that the ultimate test under the Fourth Amendment is one of " 'reasonableness.' " 100 S. Ct. at 1397. While not 'necessary', I conclude that the action of the officers, in going into Cota's house before searching and handcuffing him and advising him of his rights, was, 'reasonable' under all the circumstances. It was wintertime and after dark. It was less likely to expose him to more embarrassment in front of any neighbors who might have been looking. It might have been less frightening to the child, while the officers made the necessary inquiry regarding care for the child. The officers had an arrest warrant issued by a magistrate. They did not open the door and enter unannounced. I conclude this is not the sort of intrusion barred by the U. S. Constitution's Fourth Amendment, or by Art. I section 9 of Oregon's Constitution.' "

authorize entry into the suspect's home in the absence of necessity.

Because the officers' entry into defendant's home was unlawful, it follows that the evidence that they obtained after entry is subject to suppression. I would, therefore, reverse and remand CA A23492 for that reason, and affirm CA A23491.

**ROSSMAN, J.,** dissenting.

I believe that both the majority and Judge Buttler are wrong. Accordingly, I submit a third approach, which I feel identifies the problems with, and suggests a reasonable alternative to, the other opinions.

With respect to the issue of whether the initial entry into defendant's house was lawful, the court in *State v. Jordan,* 288 Or 391, 605 P2d 646, *cert den* 449 US 846 (1980), held that police officers may enter a private residence *to make an arrest* if they have a valid arrest warrant and probable cause to believe that the subject of the warrant is present on the premises and that an arrest warrant authorizes only the arrest and not a general search. The rule is substantially the same under the Fourth Amendment, although limited to the suspect's own residence:

> "* * * If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, *an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives* when there is reason to believe the suspect is within." *Payton v. New York,* 445 US 573, 602-03, 100 S Ct 1371, 63 L Ed 2d 639 (1980). (Emphasis supplied.)

There is no dispute but that the officers in this case had a valid arrest warrant or that their initial entry was for any purpose other than to effect the arrest. Notwithstanding that, Judge Buttler determines that, "in the absence of any necessity to do so," the officers could not enter defendant's house.

Neither *Jordan* nor *Payton* prescribes such a rule of "necessity." Apparently, Judge Buttler has decided that the officers were constitutionally required to ask defendant to step outside and join them on the porch. The creation of this

new rule out of whole cloth and its application in this case is precisely the sort of second-guessing courts should avoid in evaluating police conduct in making an arrest.

At the suppression hearing, defendant described the officers' entry and his arrest as follows:

> "Seargeant Englert, who was the first at the door, said, 'Mr. Cota?'
>
> "And I said, 'Yes,' and he handed me a piece of paper. He said that you are under arrest, and within inside of approximately five seconds he took the paper out. He grabbed me — he grabbed my hands and put one hand on one side and then took the paper out of my hand and put it on the chair, which was right inside the threshhold *[sic]* or inside the threshhold *[sic]*.
>
> "He stepped inside and took the paper out of my hand and then handcuffed me behind my back."

Although, arguably, in retrospect it may not have been *necessary* for the officers to cross the threshold to make the arrest, under these circumstances that minimal intrusion by officers armed with a warrant was *not* unreasonable. Neither Article 1, section 9, nor the Fourth Amendment requires that police officers wait at the threshold while a suspect flees. *See State v. Jordan, supra,* 288 Or at 401. Furthermore, as the court observed in *Washington v. Chrisman,* 455 US 1, 7, 102 S Ct 812, 70 L Ed 2d 778 (1982):

> "*Every arrest* must be presumed to present a risk of danger to the arresting officer. * * * There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious. Although the Supreme Court of Washington found little likelihood that Overdahl could escape from his dormitory room, *an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation.* * * *" (Citations omitted; emphasis supplied.)

The trial court correctly applied a test based on reasonableness, not necessity. However, Judge Buttler suggests that the only fair conclusion which may be drawn from the trial court's findings is that entry into the house was unjustified. I find his logic hard to follow, inasmuch as the very judge who made the findings concluded, as I have, that the officers

stepping across the threshold to handcuff defendant and thereby to place him in secure custody was not unreasonable.

The next inquiry involves the scope of the search. The issue is whether the activities of the officers following the initial entry leading to the discovery of the cocaine is prohibited by the state or federal constitutions. I do not agree with Judge Gillette's contention that the officers lost whatever rights they had as soon as they encountered Killmon. It is true, as defendant contends, that warrantless searches are *per se* unreasonable. *See, e.g., State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979). However, there are well recognized exceptions to the warrant requirement.

One recognized exception is the need for an officer to respond to a preceived emergency. *State v. Jones,* 45 Or App 617, 608 P2d 1220, *rev den* 289 Or 337 (1980). Immediately after entering the house and handcuffing defendant, the officer asked him if anyone else was in the house. He responded that there was no one else. He was noncommittal when asked where the boy's father was and if there was anyone to take care of the boy. The officers had a responsibility to determine who would look after the boy if they removed defendant, who appeared to be the only adult in the residence. They either had to find someone else in the house to care for the boy or take him to a secure environment. It was reasonable for the officers to conclude that that problem required immediate attention. The officers asked the boy where his father was and were led to the stairway where Killmon was discovered. When Killmon was asked by the officer if he was the boy's father he responded that he wanted a lawyer. That was a response he was entitled to make and perhaps not inappropriate under the circumstances. However, the response gave the officer no confirmation that Killmon was the boy's father and would be responsible for him.

The officer testified that after patting Killmon down for weapons, he went up the stairs to see if anyone else was there. The trial court concluded, and we concur, that he went up the stairs for that purpose and not to conduct a search for evidence. When he ascended the stairs, the officer was still engaged in the process of looking after the safety of the child. He was not engaged in searching for evidence. If his actions were a reasonable response to the problem needing immediate

attention, there was no constitutional violation. As we said in *State v. Jones, supra:*

> "* * * The inquiry is whether the facts available to the officer would lead a prudent and reasonable officer to see a need for immediate action to protect life or property. * * *" 45 Or App at 621.

An officer faced with such a problem must make a hasty decision to resolve it. Even if we could, in hindsight, devise an appropriate alternative action, that would not necessarily mean the officer acted unreasonably. It may have been acceptable for the officer simply to leave the child on the assumption that Killmon was the boy's father and the boy would be safe after the officers left. However, under the circumstances we cannot say it was unreasonable for the officer to take the further action of seeing if anyone else was in the house to care for the child. I conclude that the officer was lawfully at the top of the stairs when he saw the narcotics and related paraphernalia in plain view on the table.

I would, therefore, affirm.

Richardson and Van Hoomissen, J.J., join in this dissent.